1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
8                                  AT SEATTLE

9

10   JOYCE A. RHODEHAMEL,

11                          Plaintiff,              No.  C07-0081Z

12   v.
                                                    ORDER
13   ROBERT H. RHODEHAMEL, individually
     and as trustee of the Emma C. Rhodehamel
14   Trust, DEAN SARGENT, DANIEL F.
     QUICK, McKISSON, SARGENT &
15   OLIASON, P.S., CAROLE CARROLL, PAT
     CARROLL, RHR FOUNDATION, and CRC
16   PAPILLON FOUNDATION,

17                          Defendants.

18

19        THIS MATTER comes before the Court on a motion to dismiss brought by defendants

20   Carole Carroll, Patrick Carroll, and CRC Papillon Foundation (collectively, the "Carroll

21   Defendants"), a motion for summary judgment brought by defendants Dean Sargent, Daniel

22   Quick, and McKisson, Sargent & Oliason, P.S. (collectively, the "Law Firm Defendants"), a

23   motion for summary judgment brought by defendants Robert Rhodehamel and RHR

24   Foundation (collectively, the "Rhodehamel Defendants"), and a motion for sanctions brought

25   by the Rhodehamel Defendants and joined by the Carroll Defendants.  Having considered all

26   papers filed in support of and in opposition to each motion, the Court does hereby ORDER:

ORDER -  1

(1)     The Rhodehamel Defendants' and the Law Firm Defendants' respective motions to strike, docket nos. 56 and 57, are DENIED;

(2)     The Carroll Defendants' motion for dismissal, docket no. 36, is GRANTED;

(3)     The Law Firm Defendants' motion for summary judgment, docket no. 38, is GRANTED IN PART and DEFERRED IN PART;

(4)     The Rhodehamel Defendants' motion for summary judgment, docket no. 40, is GRANTED IN PART and DEFERRED IN PART;

(5)     Counts II and V are DISMISSED with prejudice; Counts III and VII are DISMISSED without prejudice; Carole Carroll, Patrick Carroll, and CRC Papillon Foundation are DISMISSED as defendants;

(6)     The remaining parties shall file SUPPLEMENTAL BRIEFS as described later herein;

(7)     The Law Firm Defendants' and the Rhodehamel Defendants' motions for summary judgment, docket nos. 38 and 40, are RENOTED IN PART to March 14, 2008;

(8)     Plaintiff's motion to correct response, docket no. 54, is GRANTED;

(9)     The Rhodehamel Defendants' and Carroll Defendants' joint motion for sanctions, docket nos. 59 and 61, is DEFERRED and RENOTED to March 14, 2008; and

(10)    The Clerk is directed to send a copy of this Order to all counsel of record.

**Background**

In this action, plaintiff Joyce Rhodehamel asserts *inter alia* breach of fiduciary duty, fraud, and conspiracy claims against principally her brother, her sister, and her deceased mother's attorneys in connection with the testamentary scheme implemented during the few years directly preceding her mother's death.  Emma Rhodehamel died in October 2004, leaving behind three adult children, Robert, Carole, and Joyce, and substantial assets.  Exhs.

41, 48, & 58 to Anderson Decl. (docket no. 46).  Approximately eleven years before her

death, while still living in Indiana, Emma had executed a Will, bequeathing her estate

equally to Robert, Carole, and Joyce.  Exh. 17 to Anderson Decl.  About three years later, in

October 1996, Emma created a revocable trust (the "Trust"), naming herself as sole trustee

and funding it with 93,440 shares of Eli Lilly & Company common stock, which had an

approximate value of $3.1 million.  Exhs. 3 & 4 to Bertram Decl. (docket no. 41); *see*

https://investor.lilly.com/chart.cfm (price at closing on Oct. 7, 1996, was $33.00); *see also*

Fed. R. Evid. 201(c)("A court may take judicial notice, whether requested or not.").  The

trust instrument provided for Robert, Carole, and Joyce to receive equal portions of the

remaining res upon Emma's death.  Art. III, Exh. 3 to Bertram Decl.  The stock split in 1997,

resulting in a trust res of 186,880 shares.  *See* https://investor.lilly.com/dividend.cfm (2-for-1

split was declared on Sep. 15, 1997, and payable on Oct. 15, 1997).

       In April 1999, at the age of 81, Emma moved from Indiana to Seattle, and began

living with Robert.  Complaint at ¶ 13 (docket no. 1).  A little over a year later, Emma started

executing documents that would drastically alter her testamentary scheme, effectively

disinherit Joyce, and give rise to this lawsuit.  On June 20, 2000, Emma signed an

amendment to the trust instrument, appointing Robert as co-trustee and changing the

applicable law to Washington instead of Indiana.  Exh. 5 to Bertram Decl.  On the same day,

Emma executed a durable power of attorney, granting Robert "all powers of an absolute

owner over [her] assets and liabilities," including the ability to "transfer any property [she]

own[ed] into any trust, whether or not created by [her], and regardless of who is benefitted

by the trust."  Exh. 24 to Anderson Decl.

       A couple of weeks later, on July 11, 2000, Emma and Robert both executed a First

Restatement of the Trust, which provided for each beneficiary to disclaim rights in the trust

property in favor of distribution upon Emma's death to a charitable remainder unitrust.  Exh.

7 to Bertram Decl.  On the same day, Emma signed a new Will under which her estate was

ORDER - 3

devised to the Trust.  Exh. 48 to Anderson Decl.  About a month later, the ECR First Living Charitable Remainder Unitrust (the "First CRUT") was established; Dean Sargent was named as trustee.  Exh. 27 to Anderson Decl.  Both Emma's and Mr. Sargent's signatures appear on the First CRUT instrument.  *Id.*  The First CRUT was funded with $25,000 and 10,000 shares of Eli Lilly & Company stock, transferred from the Trust.  *Id.*  At the time, the stock had a value of $762,500.  Exh. 41 to Anderson Decl.; https://investor.lilly.com/ chart.cfm (price at closing on Aug. 10, 2000, was $76.25).  Pursuant to the First CRUT instrument, upon Emma's death, the remaining res would be distributed to the RHR Foundation, an organization controlled by Robert.  Exh. 27 to Anderson Decl.

On the same date that the First CRUT was created, Rhodehamel Investments, LLC (the "LLC") was also established.  Exh. 15 to Bertram Decl.  The Limited Liability Company Agreement (the "LLC Agreement") bears only Emma's signature.  *Id.*  Emma was named General Manager of the LLC and retained a 70% interest; Robert, Carole, and Joyce were each assigned a 10% interest.  Exh. 28 to Anderson Decl.  The LLC was funded with $100,000 and 38,700 shares of Eli Lilly & Company stock, transferred from the Trust.  *Id.*  At the time, the stock had a value of $2,950,875.  Exh. 41 to Anderson Decl.; *see also* https://investor.lilly.com/chart.cfm (price at closing on Aug. 10, 2000, was $76.25).  Pursuant to the LLC Agreement, a member's interest in the LLC was not transferable except to another member of the LLC or a lineal descendant or ascendant of Emma Rhodehamel.  LLC Agreement at § 3.7, Exh. 15 to Bertram Decl.  A member could not withdraw capital contributions, and distributions could be made only at the sole discretion of the General Manager.  *Id.* at §§ 3.5 & 7.7.  The LLC was scheduled to dissolve on January 1, 2050, absent written agreement of all members to dissolve on an earlier date.  *Id.* at §§ 1.4 & 8.1.  At the time the LLC Agreement was executed, Joyce Rhodehamel was almost 54 years old, was unmarried, and had no children.  *See* Affidavit at ¶ 2, Exh. 1 to Anderson Decl.  From Joyce's perspective, the LLC would benefit only Carole, who had children, and Robert, who

as successor General Manager would receive a salary and would have exclusive control over the LLC.  *See* Affidavit at ¶ 11, Exh. 1 to Anderson Decl.; *see also* LLC Agreement at § 5.1, Exh. 15 to Bertram Decl.

In October 2000, Joyce's attorney, James W. Smyth of Crotty & Smyth, a firm with offices in Indiana and Illinois, wrote to Daniel Quick, Emma's attorney, and indicated that Joyce "has intentionally disclaimed the gift of LLC interest as currently structured."  Exh. 34 to Anderson Decl.  Mr. Smyth explained the tax-based reasons for Joyce's decision and then made inquiries concerning Emma's testamentary intentions so that Joyce could "request changes consistent with Emma's desires for the LLC."  *Id.*  In the letter, Mr. Smyth asked whether Emma desired for Robert to become General Manager upon her death, noted that removal of the General Manager required a vote of members holding an 80% interest in the LLC, and queried whether he correctly understood that, upon Emma's death, Robert would control more than 20% of the LLC.  *Id.*  The implication of the latter fact, if true, was that Robert could not be replaced, without his consent, as General Manager of the LLC.

In response, Mr. Quick sent a letter to Mr. Smyth stating that "Rhodehamel Investments, LLC has accepted Joyce Rhodehamel's disclaimer of the gift of an interest in the LLC."  Exh. 35 to Anderson Decl.  Mr. Quick further indicated that "since Joyce has declined to participate in the LLC, Emma feels that Joyce is not entitled to receive any further information concerning the LLC or its future management.  Emma is satisfied with the LLC agreement as it is, and does not believe any changes are necessary."  *Id.*

Approximately one month later, on November 20, 2000, Emma and Robert both executed a Second Restatement of the Trust.  Exh. 8 to Bertram Decl.  The Second Restatement removed Joyce as a remainder beneficiary.  *Id.*  On the same day, the ECR Second Living Charitable Remainder Unitrust (the "Second CRUT") was created, naming Dean Sargent as trustee and the CRC Papillon Foundation as remainder beneficiary.  Exh. 22 to Bertram Decl.  Both Emma's and Mr. Sargent's signatures appear on the last page of the

Second CRUT instrument. *Id.* The Second CRUT was funded with $25,000 and 10,000 shares of Eli Lilly & Company stock, transferred from the Trust. *Id.* At the time, the stock had a value of $877,500. Exh. 41 to Anderson Decl. (estimating the stock to be worth approximately $800,000); https://investor.lilly.com/chart.cfm (price at closing on Nov. 20, 2000, was $87.75).

In March 2001, Emma signed an amendment to the Trust, reinstating Joyce as a remainder beneficiary, but including a "no contest" provision. Exh. 9 to Bertram Decl. The "no contest" clause stated:

> After the death of the Trustor, if any person, whether a beneficiary under this Agreement or not mentioned herein shall contest this Agreement or any other estate planning document executed by the Trustor, or object to any provisions contained in this Agreement or other estate planning document, I direct the Trustee to give to such person so contesting or objecting the sum of One Dollar ($1.00) and no more in lieu of the provisions, if any, which I have made or which I might have made in this Agreement . . . for such person so contesting or objecting. For purposes of this section, other estate planning documents shall include, without limitation . . . any other estate planning document executed by me prior to or subsequent to this Agreement.

*Id.* at § 2. Contemporaneously with this final amendment to the Trust, Emma executed a new Will, which disinherited Joyce. Exh. 45 to Anderson Decl. The Will contained a similar "no contest" provision. *Id.* at Art. IV, § 1. In addition, Emma signed a letter drafted by Daniel Quick and addressed to Joyce via her attorney. Exh. 47 to Anderson Decl. The letter advised Joyce that, as a result of the recent amendments, Joyce would be an equal beneficiary of the remaining Trust property, but would not inherit any interest in the LLC or via Emma's Will. *Id.* The letter indicated Emma's desire that her "estate be settled without any contest or litigation," but did not specifically mention the "no contest" provisions incorporated into the Trust and the Will. *Id.*

About two months after the Trust and the Will were revised, in May 2001, Robert was appointed General Manager of the LLC. Exh. 51 to Anderson Decl. Approximately one year later, on May 16, 2002, Robert, as attorney-in-fact for Emma, executed a document creating the ECR Charitable Lead Annuity Trust (the "CLAT"). Exh. 23 to Bertram Decl.

ORDER - 6

1   Dean Sargent was named as trustee.  *Id.*  Emma's signature was not affixed to the CLAT

2   instrument.  *Id.*

3          The CLAT was funded with $50,000 and 15,000 shares of Eli Lilly & Company

4   stock.  At the time the stock had a value of $951,150.  *See* Exh. 41 to Anderson Decl.

5   (estimating the stock was worth $960,000); https://investor.lilly.com/chart.cfm (price at

6   closing on May 16, 2002, was $63.41).  During Emma's life, the CLAT was to pay the RHR

7   Foundation and the CRC Papillon Foundation each 50% of the annuity trust payments,

8   which were for each year 10% of the initial net fair market value of the trust assets, or about

9   $50,000 per year per foundation; upon Emma's death, the remainder of the CLAT's res was

10  to pass to Robert, Carole, and Joyce in equal shares.  Exh. 23 to Bertram Decl.  Had Emma,

11  however, lived for another ten years after formation of the CLAT, Joyce would have received

12  nothing because the trust property would have been fully exhausted by distributions to

13  Robert's and Carole's charities.  *See id.*  The CLAT was an irrevocable trust, established

14  without Emma's personal signature, and it did not itself contain a "no contest" provision.

15  *See id.*  The transfer of assets from the Trust to the CLAT was performed by the Charles

16  Schwab Corporation upon solely Robert's signature.  *See* Exh. 56 to Anderson Decl.

17         When Emma died in Seattle on October 20, 2004, Robert and Carole were both living

18  in Seattle, but Joyce resided in Indiana.  Exh. 58 to Anderson Decl.; Exh. A to Strabuk Decl.

19  (docket no. 37).  On that date, Eli Lilly & Company stock closed at $55.10 per share.  *See*

20  https://investor.lilly.com/chart.cfm.  The Trust res apparently included 113,180 shares of Eli

21  Lilly & Company stock, *i.e.*, the original amount after the 1997 stock split minus the

22  amounts transferred to the LLC, the CRUTs, and the CLAT; the stock was worth

23  approximately $6.2 million.  *Compare* Exh. 64 to Anderson Decl. (reporting that the Trust

24  assets had a fair net value of just over $6.85 million at the time of Emma's death).  On

25  January 14, 2005, both Robert and Carole executed Schedule B to the Trust, which waived

26  any right to a judicial proceeding concerning the estate pursuant to RCW 11.96A.080 (the

ORDER -  7

Trust and Estate Dispute Resolution Act, or "TEDRA"), as well as any right to contest Emma's legal capacity or to claim undue influence or fraud with respect to the execution of the Will, the various trust agreements, or the LLC Agreement. Exh. 10 to Bertram Decl. By letter dated February 18, 2005, from Daniel Quick to John Nelson of Smyth, Hester & Associates, Joyce was given a deadline of March 15, 2005, to sign Schedule B or be deemed not to have consented to the agreement and thereby precluded from receiving distributions from the Trust or the CLAT. Exh. 60 to Anderson Decl.

Joyce declined to sign Schedule B, instead filing in King County Superior Court a Petition for Judicial Determination. Exh. 6 to Anderson Decl. The petition was captioned "In re Estate of Emma L. Rhodehamel," described Robert, Carole, and Emma, but not Emma's attorneys, as parties, and sought a declaration of Joyce's rights with respect to Emma's estate. _Id._ The petition requested that Joyce be appointed personal representative for the estate, that Robert provide an accounting, that Emma be declared incompetent or subjected to undue influence during the five years preceding her death, and that Robert and Carol be required to disgorge assets received from the estate. _Id._ at §§ 3.3, 3.4, 3.6, 3.8-3.11.

As personal representative for the estate, Robert moved for summary judgment, setting a hearing date of February 15, 2006. Exh. 2 to Anderson Decl. Joyce's attorney, then only recently retained,[1] filed a motion for a thirty-day continuance of the hearing, indicating that he anticipated filing a motion for leave to amend the petition and a cross-motion for summary judgment and that he needed additional time to review the over 30,000 pages of discovery and prepare a response. Exh. 9 to Anderson Decl. King County Superior Court Judge Mary Roberts denied the motion for continuance without substantive explanation. Exh. 11 to Anderson Decl. Judge Roberts also denied a related motion to

---

[1] When the Petition for Judicial Determination was first filed and later amended, James B. Parsons of the Parsons Law Firm, which was located in Bellevue, represented Joyce. _See_ Exh. 6 to Anderson Decl. At the time the motion for continuance was filed, David A. Anderson of Anderson & Associates, P.C., a firm in Indiana, had recently been retained as lead counsel. _See_ Exh. 9 to Anderson Decl.

ORDER - 8

1   shorten time on a cross-motion, stating that petitioner had failed "to state *any* reason for

2   having not filed the [cross-]motion for summary judgment in a timely manner."  Exh. 12 to

3   Anderson Decl. (emphasis in original).

4          Judge Roberts presided over a hearing on February 16, 2006.  Exh. 4 to Anderson

5   Decl.  During the hearing, counsel for Robert Rhodehamel stated:

> There are claims that [Robert] has breached his fiduciary duty and was
> engaged in self-dealing.  I want to bring to your attention, Your Honor, that
> none of those allegations are before this Court.  They have never been pled in
> the petitioner's pleadings.  This is a will contest brought against the estate.
> Robert Rhodehamel, the personal representative, is not individually sued in this
> matter.  For them to bring a claim of breach of fiduciary duty and self-dealing
> against him personally at this juncture is simply inappropriate.

10  Transcript at 9:1-12, Exh. 4 to Anderson Decl.  After hearing argument, Judge Roberts made

11  the following oral ruling:

> I am going to grant the motion for summary judgment, with the exception of
> the Rule 11 sanctions.  I would like further briefing on that topic.  I am inclined
> to grant CR 11 sanctions based on a lack of investigation into the claims, as
> well as an improper motive in bringing the lawsuit, but I don't do that very
> often and I would like further briefing on that.

15  Transcript at 39:15-22, Exh. 4 to Anderson Decl.  Judge Roberts also issued a written order,

16  but it did not shed much more light on the basis for her decision:

> IT IS ORDERED, ADJUDGED, AND DECREED that the Personal
> Representative's Motion for Summary Judgment is GRANTED and
> Petitioner's claims are dismissed as a matter of law.  It is further
>
> ORDERED that Schedule B to the First Amendment of the Emma C.
> Rhodehamel Trust Agreement Dated November 20, 2000, and the No Contest
> provisions in Decedent's Will and Trust are hereby enforced, and, pursuant to
> these provisions, any distributions Petitioner may have been entitled to from
> the Estate of Emma C. Rhodehamel have lapsed.

22  Exh. 3 to Anderson Decl.

23         While the matter was being reviewed by the Washington State Court of Appeals,

24  Joyce filed the lawsuit now pending before this Court.  *See* Complaint (filed Jan. 17, 2007).

25  The Court stayed this case pursuant to *Colorado River Water Conservation Dist. v. United*

26  *States*, 424 U.S. 800 (1976).  Order dated April 25, 2007 (docket no. 27).  In the order

ORDER - 9

staying the case, the Court observed that "Plaintiff correctly notes, . . . and Robert apparently

agrees, that the Superior Court did not consider Joyce's claims against Robert for breach of

fiduciary duty." *Id.* at 4:11-12.  The Court also indicated that "Joyce has standing and is

entitled to have this Court consider the merits of the dispute.  While this Court has no

intention of revisiting the issues of Emma's competency and testamentary capacity, and of

the lapse of Joyce's interest in Emma's estate and trusts, the Court will consider Joyce's

right against the named Defendants." *Id.* at 6:5-9.

On June 4, 2007, the Washington State Court of Appeals issued an opinion affirming

Judge Roberts's grant of summary judgment in favor of Emma's estate.  *In re Estate of

Rhodehamel*, 2007 WL 1589457, 2007 Lexis 1410 (reproduced in Exh. 1 to Bertram Decl.,

Exh. 15 to Anderson Decl., Exh. 4 to Jenkel Decl. (docket no. 39), and Exh. E to Strabuk

Decl.).  In an unpublished decision, Judges Grosse, Agid, and Dwyer held that "the evidence

was overwhelming that the testatrix had the requisite capacity to execute the estate planning

documents and there was no evidence to support the allegation of undue influence."  2007

WL 1589457 at *1, 2007 Lexis 1410 at ¶1.  Division I observed that "[w]e have before us a

record replete with evidence from Emma's attorneys, her doctor, and her caregiver that

Emma was competent, understood the nature and extent of her property, and understood her

intended disposition."  2007 WL 1589457 at *4, 2007 Lexis 1410 at ¶18.  The Court of

Appeals further noted that any presumption of undue influence arising from the facts that

Emma resided with Robert and that Emma consulted solely with Robert's attorneys was

rebutted by counsel's declaration indicating that Emma independently sought advice and

made all of the decisions.  2007 WL 1589457 at *4, 2007 Lexis 1410 at ¶22.  The judges

found persuasive counsel's representation that "Robert's *only* involvement was an attempt on

his part to persuade his mother not to disinherit Joyce." *Id.* (emphasis added).

Finally, Division I concluded that the "no contest" provision of the Trust, as finally

amended, barred Joyce from recovering under the CLAT.  2007 WL 1589457 at *5, 2007

1  Lexis 1410 at ¶24.  The Court of Appeals, however, touched on this issue only briefly in its

2  opinion, and it did not mention the fact that Robert, not Emma, signed the CLAT instrument,

3  it did not address whether the "no contest" clause applied to documents executed by an

4  attorney-in-fact, and it did not discuss the apparent inconsistency between Robert's

5  involvement with the formation of the CLAT and counsel's declaration that Robert's role in

6  Emma's estate planning was limited.

7          In August 2007, after being advised that the state court proceedings were concluded,

8  this Court lifted the stay and returned this case to the active docket.  Order dated August 22,

9  2007 (docket no. 35).  The Court set a deadline for the parties to file motions addressing

10  whether plaintiff's claims are barred by the state court litigation, and stayed discovery and

11  the submission of a joint status report.  _Id._  Each of the three groups of defendants filed a

12  dispositive motion seeking dismissal of all of plaintiff's causes of action.  Those motions are

13  now ripe for the Court's consideration.

14  **Discussion**

15  **A.**     **Motions to Strike**

16          Plaintiff has submitted transcripts of recorded telephone conversations between

17  plaintiff and her sister, as well as between plaintiff and her mother.  The Rhodehamel

18  Defendants move to strike the transcripts of communications with Emma on the ground that

19  plaintiff did not obtain Emma's consent to the recordings.  _See_ Reply at 3 (docket no. 56).

20  The Court DENIES the Rhodehamel Defendants' motion to strike because the Washington

21  statute requiring consent of all parties to record a "[p]rivate communication transmitted by

22  telephone," RCW 9.73.030, does not apply to recordings made outside the state.  _State v._

23  _Fowler_, 157 Wn.2d 387, 395, 139 P.3d 342, 347 (2006) ("the test for whether a recording of

24  a conversation or communication is lawful is determined under the laws of the place of the

25  recording").  The Rhodehamel Defendants have cited no authority to support the proposition

26  that the recordings at issue were made in violation of Indiana law.  In contrast, the Law Firm

Defendants have conceded that, for recording of a private conversation, Indiana requires the

consent of only one party.  *See* Reply at 11 n.5 (docket no. 57); *see also Wells v. Wells*, 489

N.E.2d 972 (Ind. Ct. App. 1986) (affirming the admission into evidence of a wife's recording

of a telephone conversation with her husband pursuant to 18 U.S.C. § 2511, which permits a

private person to intercept a wire or oral communication if that person is a party to the

communication).

  The Law Firm Defendants, however, move to strike the transcripts of plaintiff's

conversations with her mother on grounds of hearsay and the deadman's statute.  With regard

to the hearsay challenge, the Court DENIES the motion to strike for failure to identify with

particularity the statements to be excluded from the Court's consideration in connection with

the Law Firm Defendants' motion for summary judgment.  The transcripts are over 100

pages in length, and not all of the contents thereof are being offered for "the truth of the

matter asserted."  Fed. R. Evid. 801(c).  With respect to the argument under the deadman's

statute, the Court also DENIES the motion to strike for lack of specificity.  Washington's

deadman's statute provides in pertinent part:

> in an action or proceeding where the adverse party sues or defends . . . as
> deriving right or title by, through or from any deceased person . . . [that person]
> shall not be admitted to testify in his or her own behalf as to any transaction
> had by him or her with, or any statement made to him or her, or in his or her
> presence, by any such deceased . . . person . . . .

RCW 5.60.030.  In interpreting the statute, the Washington State Court of Appeals has

observed that "[n]ot all testimony by a party in interest about the words or acts of the

decedent is prohibited.  The bar extends only to words or acts involving a transaction."

*Bentzen v. Demmons*, 68 Wn. App. 339, 344, 842 P.2d 1015, 1019 (1993).

  Here, the transcribed conversations between plaintiff and her mother generally do not

deal with transactions between them.  Some of the potentially relevant discussions concerned

whether Emma understood the LLC structure, or whether she knew Dean Sargent, who was

sending Joyce correspondence on Emma's behalf and who was the trustee for the First and

Second CRUTs and for the CLAT.  Exh. 1-B to Affidavit, Exh. 1 to Anderson Decl.  These conversations might relate to matters for which the doctrines of res judicata or collateral estoppel provide the basis for decision, but they do not appear inadmissible on deadman's statute grounds.  Moreover, to the extent that plaintiff's claims sound in breach of fiduciary duty as against Robert or others, as opposed to a right asserted against Emma's estate, the deadman's statute does not appear to apply at all.  *In re Davis Estate*, 23 Wn. App. 384, 385, 597 P.2d 404, 406 (1979) (deadman's statute "excludes testimony when offered against the decedent's estate").

**B.**   **Procedural Standards**

    **1.**   **Summary Judgment**

      The Court must grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson*, 477 U.S. at 249.

      When a properly supported motion for summary judgment has been presented, the adverse party "may not rest upon the mere allegations or denials" of its pleadings.  Fed. R. Civ. P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial.  *Id.*; *Anderson*, 477 U.S. at 256.  A party cannot create a genuine issue of fact by simply contradicting his or her own previous sworn statement, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), or by asserting "some metaphysical doubt" as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio*

1   *Corp.*, 475 U.S. 574, 586 (1986).  Likewise, discrediting the testimony proffered by the

2   moving party will not usually constitute a sufficient response to a motion for summary

3   judgment.  *Anderson*, 477 U.S. at 256-57.

4   　　　To survive a motion for summary judgment, the adverse party must present

5   "affirmative evidence," which "is to be believed" and from which all "justifiable inferences"

6   are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole,

7   "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is

8   warranted.  *See* *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see*

9   *also* *Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006) ("Rule 56(c) 'mandates the entry of

10  summary judgment, after adequate time for discovery and upon motion, against a party who

11  fails to make a showing sufficient to establish the existence of an element essential to that

12  party's case, and on which that party will bear the burden of proof at trial.'" (quoting

13  *Celotex*, 477 U.S. at 322)).

14  　　　**2.**　　**Failure to State a Claim**

15  　　　Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not

16  provide detailed factual allegations, it must offer "more than labels and conclusions" and

17  contain more than a "formulaic recitation of the elements of a cause of action."  *Bell Atlantic*

18  *Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).[2]  The complaint must indicate more than

19  mere speculation of a right to relief; it must provide "plausible" grounds for recovery.  *Id.*

20  When a complaint fails to adequately state a claim, such deficiency should be "exposed at

21  the point of minimum expenditure of time and money by the parties and the court."  *Id.* at

22  1966.  A complaint may be lacking for one of two reasons:  (i) absence of a cognizable legal

23  _____

24  [2] In *Twombly*, the Supreme Court expressly rejected the standard articulated in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").  *See*

25  127 S. Ct. at 1969 ("Conley's 'no set of facts' language has been questioned, criticized, and explained away long enough. . . .  [A]fter puzzling the profession for 50 years, this famous observation has earned its

26  retirement.").

ORDER - 14

1   theory, or (ii) insufficient facts under a cognizable legal claim.  *Robertson v. Dean Witter*

2   *Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  In ruling on a motion to dismiss, the

3   Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences

4   in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  If

5   the Court considers matters outside the complaint, it must convert the motion into one for

6   summary judgment.  Fed. R. Civ. P. 12(b).  If the Court dismisses the complaint or portions

7   thereof, it must consider whether to grant leave to amend.  *Laster v. T-Mobile USA, Inc.*, 407

8   F. Supp. 2d 1181, 1193 (S.D. Cal. 2005) (citing *Lopez v. Smith*, 203 F.3d 1122 (9th Cir.

9   2000)).

10  **C.      Res Judicata and Collateral Estoppel**

11          Each group of defendants asserts that the doctrines of res judicata and collateral

12  estoppel bar some or all of plaintiff's claims.  The Carroll Defendants go so far as to argue

13  that plaintiff's claims for breach of fiduciary duty and the like are precluded even though

14  neither the King County Superior Court nor the Washington State Court of Appeals

15  addressed them because plaintiff "could have" presented them, but did not properly manage

16  her case.  Motion to Dismiss at 13-14 (docket no. 36).  The Court does not adopt this latter

17  view of the posture of plaintiff's claims.

18          A thorough discussion of Washington law on res judicata and collateral estoppel is

19  contained in *Kelly-Hansen v. Kelly-Hansen*, 87 Wn. App. 320, 941 P.2d 1108 (1997).  In

20  that case, Division II observed that res judicata "is not a precise term."  *Id.* at 327, 941 P.2d

21  at 1111.  Res judicata generally refers only to preclusion of the same claim, while the term

22  collateral estoppel "denotes the preclusive principles that apply when the subsequent suit

23  involves a different claim but the same issue."  *Id.* at 327, 941 P.2d at 1112 (quoting Philip

24  A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L.

25  REV. 805 (1985)).  The Washington Supreme Court, however, "has used res judicata to mean

26  both claim preclusion and issue preclusion, saying, for example, that '[r]es judicata refers to

the preclusive effect of judgments, including the relitigation of *claims and issues* that were litigated, or might have been litigated, in a prior action.' " *Id.* at 328, 941 P.2d at 1112 (emphasis added)(quoting *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 887 P.2d 898 (1995)).  When res judicata is meant to describe just claim preclusion, it bars "not only . . . points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, *exercising reasonable diligence*, might have brought forward at that time." *Id.* at 329, 941 P.2d at 1113 (emphasis in original).  In other words, "all parts of a successful claim are merged in the final judgment" and "all parts of an unsuccessful claim are barred by the final judgment." *Id.* at 330, 941 P.2d at 1113.

In determining whether a matter should have been litigated in a prior proceeding, no one simple or all-inclusive test is used; rather, Washington courts consider a variety of factors, including "whether the present and prior proceedings arise out of the same facts, whether they involve substantially the same evidence, and whether rights or interests established in the first proceeding would be destroyed or impaired by completing the second proceeding." *Id.*  In addition, res judicata will not operate "if a necessary fact was not in existence at the time of the prior proceeding, or if evidence needed to establish a necessary fact would not have been admissible in the prior proceeding." *Id.* at 331, 941 P.2d at 1114.  Similarly, res judicata will not operate in the face of valid reasons for not previously asserting the claim, for example, when "the matter was an independent claim not required to be joined, or if the matter's omission from the prior proceeding actually benefitted, rather than vexed, the party now purporting to rely on res judicata." *Id.*

Here, while attempting to litigate her claims in Washington from her residence in Indiana, plaintiff apparently grew dissatisfied with her Bellevue-based attorney and took affirmative steps to obtain different representation.  Her new counsel immediately sought a continuance, making known his desire to amend the petition and present additional claims.

1   In denying the additional time requested, Judge Roberts provided no explanation.  This

2   record of events in King County Superior Court does not evidence a lack of reasonable

3   diligence on plaintiff's part.  Moreover, some of the evidence on which plaintiff seeks to rely

4   in this case, for example transcripts of conversations with her mother, probably would not

5   have been admissible in the state court proceedings.  Finally, no showing has been made that

6   the breach of fiduciary duty and other claims now at issue were subject to mandatory joinder

7   in the state court action, and the parties currently claiming res judicata benefitted from the

8   previous omission of those claims.

9        Thus, plaintiff's claims for breach of fiduciary duty and the like are not barred on res

10   judicata or collateral estoppel grounds for failure to present the claims in the prior state court

11   action.  The state court decisions have preclusive effect only with respect to the matters

12   actually litigated, namely that Emma had the requisite capacity to execute the documents she

13   signed, that the evidence presented by Joyce was insufficient to prove undue influence by

14   Robert upon Emma, and that the "no contest" provision of the First Amendment to the

15   Second Restatement of the Trust extended to the CLAT.  None of these rulings, however,

16   fully vitiate plaintiff's causes of action in this case, which involve the activities of plaintiff's

17   brother and sister and of her mother's attorneys, as opposed to Emma's mental state, and the

18   merits of plaintiff's claims therefore must be addressed.

19   **D.    Fiduciary Duties of Trustee**

20        **1.    To Remainder Beneficiaries**

21        The Rhodehamel Defendants assert that a trustee of an inter vivos revocable trust

22   owes no fiduciary duty to the remainder beneficiaries, and that, plaintiff's claim against

23   Robert for breach of fiduciary duty therefore lacks merit.  They, however, cite no

24   Washington case directly on point.  They offer only cases from other states that are factually

25   distinguishable.  For example, in both cases from Utah and the case from Texas cited by the

26   Rhodehamel Defendants, the trustee was also the settlor (or co-settlor) of the trust, who

ORDER - 17

retained the ability to partially or completely revoke the trust.  *In re Estate of West*, 948 P.2d 351 (Utah 1997); *Perrenoud v. Harman*, 8 P.3d 293 (Utah Ct. App. 2000); *see* *Moon v. Lesikar*, 230 S.W.3d 800 (Tex. Ct. App. 2007).  Similarly, in the Nevada case to which the Rhodehamel Defendants referred, the trustee was the settlor of a revocable trust, and was still alive (although apparently incompetent) at the time the remainder beneficiaries challenged amendments to the trust.  *Linthicum v. Rudi*, 148 P.3d 746 (Nev. 2006).  In all four cases, the courts held that remainder beneficiaries either have no standing or have no claim when the settlor of a revocable trust transfers or otherwise disposes of trust property; such actions operate as a partial or complete revocation of the trust and divest the remainder beneficiaries of their rights.  *See Linthicum*, 148 P.3d at 749; *Moon*, 230 S.W.3d at 803-06; *In re Estate of West*, 948 P.2d at 356 ("The children's vested rights are subject to divestiture and will not ripen until the death of the surviving settlor. . . .  Consequently, we conclude that Herschel West, Sr., as sole trustee [and sole surviving settlor], could sell or dispose of the property as he saw fit."); *Perrenoud*, 8 P.3d at 296-98.

In contrast, here, plaintiff's breach of fiduciary claim concerns, at least in part, actions taken by a co-trustee who was not a settlor of the trust.  Robert executed the instrument creating the CLAT as attorney-in-fact.  As trustee, Robert transferred money and stocks from the Trust to the CLAT.  Emma's signature does not appear on either the CLAT or the authorization for Charles Schwab to transfer Trust property to the CLAT.  The parties, however, have not adequately addressed whether Joyce has standing to contest Robert's actions with respect to the CLAT.  Thus, the remaining parties are DIRECTED to file supplemental briefs addressing the following issues:  (i) whether a trustee who is not a settlor of a trust owes a fiduciary duty to the remainder beneficiaries; (ii) whether a trustee who is not a settlor of a trust, but is a remainder beneficiary of the trust, owes a fiduciary duty to the other remainder beneficiaries; (iii) if a fiduciary duty exists, what is the scope of that duty; and (iv) whether and to what extent a trustee of an improperly created trust (here, potentially,

the CLAT) owes a fiduciary duty to the remainder beneficiaries of said trust.  In preparing their supplemental briefs, the parties should review *Siegel v. Novak*, 920 So.2d 89 (Fla. Dist. Ct. App. 2006).

The Rhodehamel Defendants and the Law Firm Defendants may file separate or joint opening supplemental briefs.  If separate, the opening supplemental briefs shall not exceed 12 pages in length; if joint, the opening supplemental brief shall not exceed 24 pages in length.  The opening supplemental brief(s) shall be filed by February 21, 2008.  Plaintiff's responsive supplemental brief shall not exceed 24 pages in length and shall be filed by March 10, 2008.  Separate supplemental reply briefs, not exceeding 6 pages in length, or a joint supplemental reply brief, not exceeding 12 pages in length, may be filed by March 14, 2008.  The Rhodehamel Defendants' and the Law Firm Defendants' motions for summary judgment are RENOTED IN PART to March 14, 2008.

## 2.    To Diversify Assets

The Rhodehamel Defendants request a ruling that Robert, as trustee, had no duty to diversify the Trust assets.  They cite provisions of the Washington Trust Act of 1984 ("Trust Act") as support.  The statute codifies the "prudent investor" rule, which requires a trustee to exercise the judgment and care that persons of prudence, discretion, and intelligence use in the management of their own affairs.  RCW 11.100.020(1); *see also* *In re Estate of Cooper*, 81 Wn. App. 79, 88-89, 913 P.2d 393, 398 (1996); *Baker Boyer Nat'l Bank v. Garver*, 43 Wn. App. 673, 678, 719 P.2d 583, 587 (1986) ("RCW 30.24.020 [now RCW 11.100.020] codified the prudent person rule").  The statute contemplates that a fiduciary will diversify investments unless contrary to the terms of the trust, inconsistent with the purposes of the trust, or not required by other provisions of the Trust Act.  RCW 11.100.047.  The Trust Act provides that "[e]xcept as to trust property acquired for consideration, a fiduciary may hold and retain any such property without need for diversification as to kinds or amount and whether or not the property is income producing."  RCW 11.100.060.

ORDER - 19

1    The Rhodehamel Defendants contend that RCW 11.100.060 insulates Robert from

2    liability for not diversifying the portfolio of stocks in the Trust.  They are correct.  Here, the

3    Eli Lilly & Company stock was part of the original Trust res and was not acquired for

4    consideration.  The Trust instrument contemplated that the stock would be held and then

5    distributed upon Emma's death to her children.[3]  Thus, Robert had no duty to diversify.

6    Plaintiff's response on this issue lacks merit.  Plaintiff appears to argue that a broader

7    common law duty survives the enactment of the Trust Act.[4]  Plaintiff cites two cases for

8    support, but both cases concern trusts created before the effective date of RCW 11.100.060.

9    *See* *In re Estate of Cooper*, 81 Wn. App. at 83, 913 P.2d at 395 (testamentary trust

10   established in 1978); *Garver*, 43 Wn. App. at 675, 719 P.2d at 586 (testamentary trusts

11   created in 1964 and 1969); *compare* RCW 11.02.901 (Trust Act applies "to all instruments,

12   property relationships, and proceedings existing on January 1, 1985").  Moreover, both cases

13   involve testamentary trusts, not inter vivos revocable trusts, and therefore do not address the

14   effect of a settlor's decisions concerning the disposition of Trust assets, which decisions

15   cannot be challenged by remainder beneficiaries.  The Court therefore GRANTS partial

16   summary judgment in favor of Robert Rhodehamel on plaintiff's claim for breach of

17   fiduciary duty to diversify investments and DISMISSES with prejudice Count II of the

18   Complaint.

19

20

21   _____

22   [3] The Rhodehamel Defendants argue that, for tax reasons, Emma's and/or Robert's decision not to diversify the
     stock portfolio resulted in a greater Trust res at the time of Emma's death.  Motion for Summary Judgment at
23   17 n.72 (docket no. 40).  Given the overall decrease in Eli Lilly & Company share prices over the life of the
     trust, the Rhodehamel Defendants' analysis appears a bit simplistic, and the question whether a prudent
24   investor would have sold the stock and invested the Trust assets differently seems to be a factual dispute.  In
     light of the applicable legal standard, however, the Court does not reach this issue.

25   [4] Plaintiff made a different argument in the original response brief; plaintiff then moved to amend the response
     to make the contention summarized above.  *See* Motion to Correct (docket no. 54).  The Court GRANTS
26   plaintiff's motion to correct, and it has considered only the substituted analysis.

ORDER -  20

1        ### 3.        To Transfer or Distribute

2        The exact nature of plaintiff's claim concerning fraudulent transfer remains unclear.

3   She has asserted the claim against Robert and Carole, and their respective foundations, as

4   well as Dean Sargent.  To the extent plaintiff challenges transfers made pursuant to the LLC

5   Agreement or the two CRUT instruments, all of which were signed by Emma, plaintiff has

6   no standing to contest those transactions.  _See, e.g._, _In re Estate of West_, 948 P.2d at 356 (the

7   settlor of a trust can sell or dispose of assets as he or she sees fit).  The Court therefore

8   GRANTS partial summary judgment in favor of the Carroll Defendants as to the fraudulent

9   transfer claim in toto, and in favor of the Rhodehamel Defendants and Dean Sargent with

10  respect to transfers to the LLC and the two CRUTs.  With respect to the transfer of property

11  from the Trust to the CLAT, however, the Court DEFERS ruling until after it reviews the

12  requested supplemental briefs.

13  ### E.        Fraud and Conspiracy

14       In response to the pending motions, plaintiff has identified the elements of fraud[5] and

15  conspiracy,[6] but has offered no evidence to support those claims.  With regard to the claim of

16  fraud, plaintiff has not identified any representations of material fact made by any defendant

17  that were either false or uttered with the requisite intent.  With regard to the claim of

18  conspiracy, plaintiff has not proffered any evidence of the requisite agreement.  The Court

19  recognizes, however, that plaintiff has not yet had an opportunity to conduct discovery in

20  this matter.  Thus, with respect to the fraud and conspiracy claims, the Court treats the

21  _____

22  [5] Every element of fraud must be established by "clear, cogent, and convincing evidence."  _Stiley v. Block_, 130
    Wn.2d 486, 505, 925 P.2d 194, 204 (1996).  Under Washington law, fraud is defined as a representation of an
23  existing, material fact, which is knowingly false, and which is made with the intent for another, who is ignorant
    of the falsity, to act in reliance on the truth of the representation, thereby causing that person to suffer damages.
24  _Id._

25  [6] Under Washington law, to prove civil conspiracy, a plaintiff must establish by "clear, cogent, and convincing
    evidence" that two or more people entered into an agreement to accomplish an unlawful purpose or to
26  accomplish a lawful purpose via unlawful means.  _Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins._
    _Group, Inc._, 114 Wn. App. 151, 160, 52 P.3d 30, 35 (2002).

1   pending motions as seeking dismissal pursuant to Rule 12(b)(6), and the Court DISMISSES

2   Counts III and VII, but without prejudice to plaintiff filing a motion for leave to amend

3   within 60 days of the date of this Order.

4   **F.**    **Disclaimer of Interest in LLC**

5           Plaintiff seeks an accounting of the LLC, asserting that the disclaimer of her interest

6   in the LLC, contained in her attorney's letter to Daniel Quick, did not meet statutory

7   requirements and is therefore not valid.  _See_ Response at 9 n.55 (docket no. 47).  Although

8   plaintiff's argument that the disclaimer is not enforceable has technical merit, it does not

9   entitle plaintiff to the remedy she seeks.  Under Washington law, a beneficiary may disclaim

10  an interest in whole or in part.  RCW 11.86.021.  Such interest may be one created by

11  intestate succession, pursuant to a will or trust, or created by any testamentary or inter vivos

12  instrument or by operation of law.  RCW 11.86.011(2)(a), (b), (c), & (o).  If an interest is

13  disclaimed, then the interest passes as if the beneficiary had died immediately before transfer

14  of the interest, which for an inter vivos transaction is the date of creation.  RCW 11.86.041;

15  _see_ RCW 11.86.011(7)(a).  To be valid, a disclaimer must be in writing, be signed by the

16  disclaimant, identify the interest to be disclaimed, and recite the disclaimer and extent

17  thereof.  RCW 11.86.031(1).  A beneficiary may disclaim via an agent or attorney if the

18  agent or attorney is so authorized by written instrument.  RCW 11.86.021(2).  Here,

19  plaintiff's disclaimer is via letter, not signed by plaintiff and not associated with a written

20  instrument authorizing plaintiff's attorney to sign on her behalf.  Thus, the disclaimer does

21  not meet statutory requirements.  Moreover, the disclaimer is equivocal, purporting to

22  disclaim the interest in the LLC "as currently structured," but seeking information for the

23  purpose of "request[ing] changes consistent with Emma's desires for the LLC."

24          Plaintiff, however, fails to provide any analysis concerning the effect of invalidating

25  the disclaimer.  The record reflects that Emma understood plaintiff to be refusing an interest

26

1  in the LLC.  For plaintiff to claim otherwise is simply disingenuous.  As a result of plaintiff's

2  declination, the membership of the LLC was amended from 10% for each of Emma's three

3  children to 25% each for Robert and Carole.[7]  *See* Exhs. 28 & 42 to Anderson Decl.  The

4  increase in Robert's and Carole's shares of the LLC was accomplished via gift by Emma

5  pursuant to Section 3.7 of the LLC Agreement, which states in part that "[a] Member shall

6  have the authority in his or her sole discretion to transfer all or any portion of the Member's

7  interest in the Company to any other Member."  Exh. 15 to Bertram Decl.  Because the

8  transfer of assets from the Trust to the LLC was made at Emma's direction, and because the

9  redistribution of LLC shares was made via Emma's notarized signature, plaintiff has no

10  grounds to unwind her exclusion from the LLC; Emma could have made these same

11  arrangements even if plaintiff had not purported to disclaim her interest.  In light of the

12  record concerning Emma's understanding of plaintiff's intent, plaintiff will not now be heard

13  to complain that she should have received some share of the LLC.  Thus, the Court GRANTS

14  partial summary judgment against plaintiff with regard to her declaratory judgment and

15  accounting claim, and DISMISSES with prejudice Count V of the Complaint.

16  **Conclusion**

17        For the foregoing reasons, the Carroll Defendants are DISMISSED from this action,

18  Counts II and V are DISMISSED with prejudice, and Counts III and VII are DISMISSED

19  without prejudice.  With regard to Counts I, IV, and VI, to the extent they involve the CLAT,

20  the Court DEFERS ruling on the Rhodehamel Defendants' and the Law Firm Defendants'

21  motions for summary judgment and DIRECTS the parties to file supplemental briefs.

22  ///

23  ///

24  ///

25

26  [7] The membership shares were subsequently revised to reflect 20% for Emma, 40% for Robert, and 40% for
Carole.  Schedule 1 dated Jan. 4, 2002, Exh. 20 to Bertram Decl.

1    IT IS SO ORDERED.

2    DATED this 29th day of January, 2008.

3

4                                    Thomas S. Zilly
                                     United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26